UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PATRICK CLOUTIER,<br><br>*Plaintiff*,<br><br>v.<br><br>LEDYARD BOARD OF EDUCATION and SHERI TERNOWCHEK,<br><br>*Defendants*. | Civil No. 3:20cv1690 (JBA)<br><br>December 17, 2021 |

**RULING ON MOTION TO DISMISS**

Plaintiff Patrick Cloutier filed this lawsuit against Defendants Ledyard Board of Education and Shari Ternowchek stemming from Defendants' alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-58, *et seq.* Specifically, Plaintiff alleges that Defendants created a hostile work environment, subjected him to disparate treatment, and wrongfully terminated him, based on impermissible considerations of his status as a white, heterosexual male. (*See* Am. Compl. [Doc. # 9] ¶¶ 49-63.) Defendants now move to dismiss the complaint in its entirety. (*See* Def.'s Mot. to Dismiss ("Def.'s Mot.") [Doc. # 34].)

**I.   Facts Alleged**

Plaintiff was employed intermittently by Defendant Ledyard Board of Education as a substitute teacher at various schools between May 2018 and June 2019. (Am. Compl. ¶ 5.) Plaintiff, who identifies as a straight, Caucasian, white male of Russian ancestry, alleges that he was repeatedly harassed, physically and verbally, called inappropriate names by staff, teachers, principals, assistant principals, and the Assistant Superintendent. (*Id.* ¶ 6.)

Plaintiff claims that Defendant's representatives verbally harassed him when they snickered and mocked him, as well as made "nasty comments" and called him names such as "slut, whore, man-whore, gigolo, homosexual, gay, faggot, and Nazi."[1] (*Id.* ¶ 7.) These individuals also made "crotch grabbing" gestures toward him, stared and glared at him, and physically blocked his path to intimidate him. (*Id.* ¶¶ 8, 26, 29, 32.) Plaintiff also alleges that "on at least four different occasions" he picked a work assignment only to learn that he was "forced to work another harder assignment while his chosen assignment was given to a female substitute" when he reported for work.[2] (*Id.* ¶¶ 55-57.)

The Second Amended Complaint describes an ensemble of characters, members of management in the Ledyard school system among them, who engaged in the chorus of harassment hurled against Plaintiff, including: Ann Hogsten, Assistant Superintendent of Ledyard Schools; William Turner, Vice Principal of Ledyard High School; James Buonocore, Vice Principal of Ledyard High School; Andrew T., an interim principal of Juliet Long School; Dr. Pamela Austen, Principal of Gallup Hill Elementary School; Shari Ternowchek, Vice Principal of Juliet Long School; Ms. Russak, a math teacher; Robin Harris, a secretary; Nick Gray, a paraprofessional; Robert McCray, a paraprofessional; and Jill Evans, an IT specialist.

For instance, Plaintiff alleges that Ann Hogsten responded: "Do you want me to slut shame you?" during an exchange initiated by Plaintiff when he complimented her dress. (*Id.* ¶ 10.) Hogsten, acting as Assistant Superintendent, told a "female guest" of Gallup Hill

---

[1] As Plaintiff's counsel conceded at oral argument, that Plaintiff was referred to as a "Nazi" might have offended Plaintiff, but he does not advance a coherent theory as to how that insult contributed to a hostile work environment as alleged in the Amended Complaint. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting that the Court's Title VII standards "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language" (quotations omitted)).

[2] Plaintiff's complaint alleges four incidences of this but supplies allegations of just two specific occasions.

Elementary School that Plaintiff "likes an old lady" referring to the older woman whom Plaintiff was dating. (*Id.* ¶¶ 12, 31.) Finally, Plaintiff alleges that Hogsten was Assistant Superintendent of Ledyard Schools when she terminated his employment on July 15, 2019. (*Id.* ¶ 11.) Next, Robin Harris, the secretary of Defendant's central office, "repeatedly ended telephone conversations . . . by saying the word 'whore' and, on one occasion, told him she didn't want to talk to him." (*Id.* ¶ 13.)

Moreover, Plaintiff claims that several of his coworkers and superiors made disparaging comments about his sexuality and preferences. For example, "Dr. Pamela Austen, the Principal, Gallup Hill Elementary School, was standing with Ms. Emily Reed (4th grade teacher) as the Plaintiff was entering the school and Dr. Austen remarked to Reed: 'Patrick likes an old lay,'" referring again to the woman with whom Plaintiff had romantic relations.[3] (*Id.* ¶ 18.) In another exchange between Dr. Austen and Reed, Plaintiff overheard Reed ask Dr. Austen, "Do you really think he's a gigolo?"[4] Dr. Austen replied: "No, but that's what he's being branded." (*Id.* ¶ 20.) Moreover, Plaintiff alleges "Jill Evans, IT Specialist at the Gallup Hill School, called the Plaintiff a 'whore' on several occasions throughout the school year. Periodically, when she passed by him, she would say 'whore', after he had said hello to her." (*Id.* ¶ 22.) Plaintiff claims that Ms. Russak, a math teacher at Ledyard High School, inexplicably called Plaintiff a "whore" sometime during the fall of 2018. (*Id.* ¶14.) Plaintiff alleges that he once was reprimanded by Mr. William Turner, a Vice Principal of Ledyard

---

[3] Plaintiff emphasizes that this reference to an "old lay" is not a typographical error, but another insult. (Am. Compl. ¶ 18.)

[4] A gigolo is defined by Merriam-Webster as "a man supported by a woman usually in return for his attentions." *Gigolo*, MERRIAM-WEBSTER'S DICTIONARY (3d ed. 1993). The Free Dictionary defines the word as referring to "a man living off the earnings or gifts of a woman, esp. a younger man supported by an older woman in return for his sexual attentions and companionship." *Gigolo*, THE FREE DICTIONARY, https://www.thefreedictionary.com/gigolo (last visited Dec. 10, 2021).

3

High School, for speaking Russian in a classroom. (*Id.* ¶ 15.) Apparently, Mr. Turner and Mr. James Buonocore, made multiple hostile remarks toward him, including on one occasion in which Buonocore mouthed the word "homosexual" at Plaintiff. (*Id.* ¶ 17.)

In addition, Plaintiff alleges a physical element to the harassment. The Second Amended Complaint describes how Mr. McCray "grabbed his crotch, while glaring at Plaintiff" and made "gestures" with "a hostile look on his face" on more than one occasion. (*Id.* ¶ 24-26.) Another employee of Defendant, Mr. Grey, joined Mr. McCray in the physical intimidation "on a number of occasions." (*Id.* ¶ 29.) Other physical intimidation "took the form of physically blocking the plaintiff's path and access to sit at the teacher's table in the cafeteria and impeding the plaintiff's free access and egress in the hallways of the school and in the cafeteria." (*Id.* ¶ 32.)

In sum, Plaintiff claims that these incidents amounted to "harassment and disparate treatment" including "unfair admonitions, instructions not to speak Russian, reprimands for pretextual reasons and selective enforcement of rules and policies based upon discriminatory animus" toward Plaintiff. (*Id.* ¶ 33.) He alleges that this series of harassing conduct led to his termination after he played a video for students depicting a documentary of music artist Justin Bieber wherein Bieber engaged in lewd and disrespectful behavior. (*Id.* ¶¶ 34-38.) Plaintiff concedes that he found the video to be inappropriate at the time that he showed it to students. (*Id.* ¶¶ 34-38.) Despite this, he claims he was "perp walked" out of the building and terminated July 25, 2019 "for vague reasons." (*Id.* ¶¶ 39-40.)

The saga, however, does not conclude there. Plaintiff alleges that on or about June 20, 2020—nearly a year after his termination—Shari Ternowchek, Vice Principal of Juliet Long School, reprised the harassment by filing a complaint with the Connecticut Department of Children and Families ("DCF") and the Ledyard Police Department against Plaintiff alleging "inappropriate conduct" in connection with the video Plaintiff played for the students. (*Id.*

¶¶ 41-42.) Ternowchek also opposed Plaintiff's application to obtain unemployment benefits through the Connecticut Department of Labor ("DOL"). (*Id.* ¶ 43.) Despite Ternowchek's efforts, the Ledyard Police Department and DCF declined to investigate and DOL awarded Plaintiff unemployment benefits. Plaintiff alleges that Ternowchek knew that her complaints would harm Plaintiff's career (Plaintiff alleges that he has been harmed because he now is required to answer "yes" on teaching applications that ask if he has been referred to DCF) and that it was a continuation of the harassment based on his race, color, and gender/gender expression he alleges he endured as a substitute teacher for the Ledyard school system prior to his termination.[5] (*Id.* ¶¶ 45-47.)

On September 14, 2020, Plaintiff received a right to sue letter from the EEOC; and on August 26, 2020, he received a release of jurisdiction from the Connecticut Commission on Human Rights and Opportunities—exhausting all administrative remedies. (*Id.* ¶ 4c.) Plaintiff filed his Second Amended Complaint, the operative complaint, on March 15, 2021. Plaintiff brings six counts: (1) Hostile Work Environment in violation of Title VII; (2) Hostile Work Environment in violation of the Connecticut Fair Employment Practices Act; (3) Disparate Treatment in violation of Title VII; (4) Disparate Treatment in violation of the Connecticut Fair Employment Practices Act; (5) Wrongful Termination in violation of Title VII; and (6) Wrongful Termination in violation of the Connecticut Fair Employment Act. (*See* Am. Compl. ¶¶ 49-63.) Before the Court is Defendant's motion to dismiss the Second Amended Complaint on all counts.

---

[5] The Court addresses only the allegations of sex discrimination as Plaintiff conceded at oral argument that he has not sufficiently pleaded a coherent theory of discrimination based on his race or national origin.

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sarmiento v. United States*, 678 F.3d 147, 152 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The complaint must be interpreted liberally, all allegations must be accepted as true, and all inferences must be made in the plaintiff's favor. *Heller v. Consolidated Rail Corp.*, 331 F. App'x. 766, 767 (2d Cir. 2009) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). Motions to dismiss "assess the legal feasibility of the complaint" and are "not the appropriate place to weigh the likelihood of success on the merits of a claim." *In re Walnut Hill, Inc.*, 2019 WL 2092383, at *3 (Bankr. D. Conn. May 10, 2019) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)). But a complaint that only "offers 'labels and conclusions'" or "naked assertions devoid of further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Rather, a complaint must plead factual allegations that "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and must be "plausible on its face." *Id.* at 570.

Courts in this Circuit analyze a 12(b)(6) motion to dismiss an employment claim that would ordinarily be resolved by way of *McDonnell Douglas*[6] analysis on a motion for

---

[6] *McDonnell Douglas* established that the requirements of a prima facie case for a plaintiff alleging employment discrimination change as the case progresses. 411 U.S. 792 (1973). Ultimately, the plaintiff will be required to prove that the employer-defendant acted with discriminatory motivation by showing: (1) that he is a member of a protected class; (2) that he was qualified for employment in the position; (3) that he suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981). Such a showing will raise a temporary "presumption" of discriminatory motivation, shifting the burden of production to the employer and

6

summary judgment by determining whether the facts pleaded, if proven, amount to a basis for a plausible prima facie case. *See Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015) (holding that a plaintiff must plead facts sufficient to plausibly support each element of prima facie case).

## III. Discussion

### A. Hostile Work Environment[7]

This matter raises the difficult question whether Plaintiff, who is a cisgender,[8] heterosexual male, may survive a motion to dismiss where he has alleged discrimination based on sex due to sexual insults he endured from supervisors and coworkers.

Defendant Ledyard Board of Education maintains that he cannot. Defendant first argues that Plaintiff's allegations do not support an inference that he suffered discrimination against a protected class. (Def.'s Mot. at 9-11.) Defendant contends that because Plaintiff does not allege that he is a gay male or that any of the alleged comments were spoken by individuals who identify as gay, Plaintiff's allegations of harassment because of sex are deficient. (*Id.* at 9-10.) According to Defendant, Plaintiff's allegations that Defendant's representatives called him "whore" or "gay" or "homosexual" are not sufficient because he does not claim to be a woman or to be a gay man. (*Id.* at 7-8.) Defendant also argues that the

---

requiring the employer to come forward with its justification for the adverse employment action against Plaintiff. *Id.*

[7] Claims under CFEPA are analyzed in the same manner as those under Title VII. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010); *Kearney v. City of Bridgeport Police Dept.*, 573 F.Supp.2d 562, 573 (D. Conn. 2008) (citing *Brittel v. Dep't of Corr.*, 247 Conn. 148, 164 (1998)).

[8] A person described as cisgender is one "whose gender identity corresponds with the sex the person had or was identified as having at birth." *Cisgender*, MERRIAM WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/cisgender (last accessed Dec. 10, 2021).

"remaining allegations are clearly facially neutral, as no facts are pleaded to indicate that these employees, treated him differently because he was straight, white, or Russian." (*Id.* at 10.) Next Defendant argues that the conduct Plaintiff has alleged was not severe or pervasive. (*Id.* at 12-13.) Instead, Defendant contends that the allegations merely state that "several staff members made isolated comments about his dating an older woman and that one employee made regular 'homosexual' comments . . . over the course of a year and a few months." (*Id.* at 12.) Essentially, Defendant argues that Plaintiff's hostile work environment claim consists of several isolated words which merely comprise commonplace bad talk and do not express animus on the basis of any protected class. (*Id.* at 13.)

Plaintiff counters that "[t]he theme here is that the Plaintiff, Patrick Cloutier, was derided for dating an 'old lady' and management participated in such hostility and derision to the point where teachers and paraprofessional took a cue from management that it was acceptable to harass the Plaintiff, call him a 'whore,' 'gigolo,' 'gay,' 'Nazi,' and 'homosexual' and physically intimidate and block his physical path on many occasions throughout the school year." (Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n") at 6-7.) Plaintiff argues that his treatment was severe because management and employees "branded" him using derogatory terms regarding his sexual preferences—animus he claims is based upon his sex and his inability to conform to masculine stereotypes. (*Id.*) Plaintiff further argues that the behavior of his superiors and colleagues was pervasive because it involved inappropriate comments and gestures from several people in the work environment and was "perpetuated" by management throughout the course of the 2018-19 school year. (*Id.*)

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has held that Title

8

VII "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (citations and internal quotation marks omitted). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).

Thus, to state a claim for a hostile work environment on the basis of sex in violation of Title VII, "a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of a plaintiff's sex." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotations and citations omitted).

A work environment's hostility should be assessed based on the "totality of the circumstances." *See Harris*, 510 U.S. at 23. Among the factors a court may consider in determining whether a work environment is objectively hostile are: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation omitted). "The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Carrero v. N.Y. City Hous. Auth*. 890 F.2d 569, 577 (2d Cir. 1989). While the Second Circuit instructs that hostile work environment claims must meet a high standard, the Court also cautions against "setting the bar too high," and has noted that "the test is whether the harassment is of such a quality or quantity that a reasonable employee would find the

9

conditions of her employment altered for the worse." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (internal quotations omitted); *see also Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 439 (2d Cir. 1999) ("There is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.").

"The sine qua non of a gender-based discriminatory action claim under Title VII is that 'the discrimination must be because of sex.'" *Patane*, 508 F.3d at 112 (quoting *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 189 (2d Cir. 2001)). This includes discrimination against a person who does not conform to gendered stereotypes. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). To uncover sex discrimination based on gendered stereotypes, an understanding of the social context of the environment in which the stereotyping takes root is critical. *See Oncale v. Sundowner Offshore, Servs. Inc.*, 523 U.S. 75, 81-82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). In male sex stereotyping cases, "simply being different" from the dominant form of masculinity in the workplace can mark that man as "not a *real* man" and harassment stemming from that deviation may signal discriminatory intent because of sex.[9] *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999) ("[J]ust as a woman can ground an action on a claim that men discriminated against her because she did not meet stereotyped expectations of femininity, a man can ground a claim on evidence that other men

---

[9] *See* Luke A. Boso, *Real Men*, 37 U. Haw. L. Rev. 107, 149 (2015).

discriminated against him because he did not meet stereotyped expectation of masculinity.").

The Second Amended Complaint does not reveal what inspired the vitriol pervading Plaintiff's workplace during the 2018-19 school year. But it casts in stark relief the sexualized animus Plaintiff's coworkers and supervisors targeted at him for over a year. Plaintiff alleges eleven members of school staff and administration who made comments and gestures to Plaintiff that were more than just sexually inappropriate.

Consider the secretary of Defendant Ledyard Board of Education's central office, Robin Harris. Plaintiff claims that she "repeatedly ended telephone conversations . . . by saying the word 'whore.'" (Am. Compl. ¶ 13.) Harris was not the only one to jeer Plaintiff with sexual epithets. According to Plaintiff, "Jill Evans, IT Specialist at the Gallup Hill School, called the Plaintiff a 'whore' on several occasions throughout the school year. Periodically, when she passed by him, she would say 'whore', after he had said hello to her." (*Id.* ¶ 22.) Plaintiff also alleges that one Ms. Russak, a math teacher at Ledyard High School, inexplicably called Plaintiff a "whore" sometime during the fall of 2018. (*Id.* ¶14.)

Then there is Anne Hogsten, the Assistant Superintendent for the Ledyard Board of Education. Plaintiff alleges that Hogsten threatened to "slut shame" him in one instance and in another told a "female guest" that he "likes an old lady" referring to an older woman he was seeing romantically. (*Id.* ¶¶ 10, 12, 31.) The latter reference to the older woman was not offhand, nor did it lack context. Instead, it is an example of how Plaintiff claims he was branded by his coworkers, with the participation of the administration, as a "gigolo" because he "likes an old lay." (*Id.* ¶ 18, 20.)

All told, the conduct of Plaintiff's coworkers found in the Second Amended Complaint raises an inference that he can establish a prima facie claim of a hostile work environment under Title VII. Had the environment Plaintiff presents merely involved isolated,

indiscriminate invectives, his hostile work environment claims might not escape a motion to dismiss. *See Faragher*, 524 U.S. at 788 ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999) (concluding that "rude" and "derogatory" comments do not violate Title VII). But the Second Amended Complaint does more; it portrays a campaign of sustained sexual insults specifically directed at Plaintiff and endorsed by the participation of various school administrators. Teachers, secretaries, principals, and even the assistant superintendent allegedly taunted him using sexually derogatory names that called into question his masculinity, however they defined that term. (Am Compl. ¶ 7.) Some of the jeering was accompanied by crotch-grabbing gestures and other physical intimidation. (*Id.* ¶ 8.) The acrimony was so pervasive that Plaintiff was "branded" with an unsavory name to signal to others that he had a taboo romantic interest in older women worthy of widespread ridicule. (*Id.* ¶ 20.) This rumor raises an inference of harassment that goes beyond isolated indignities. *See, e.g.*, *Howley v. Town of Stratford*, 217 F.3d 141, 145, 148, 154-55 (2d Cir. 2000) (holding that dissemination of untrue rumors about the plaintiff, among other things, contributed to a hostile work environment, based on sex, where the plaintiff was the only woman among 100 firefighters and other harassing conduct referred to her performance of sexual acts on men). Taking these allegations at face value, Plaintiff's conditions of employment may be properly characterized as "altered for the worse." *Terry*, 336 F.3d at 148.

To be sure, many deviations from male gendered stereotypes reveal themselves in the context of same-sex sexual orientation or transgender identity. *See, e.g.*, *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 122 (2d Cir. 2018) (same-sex sexual orientation); *EECO v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 580-81 (6th Cir. 2018) (transgender identity).

But the principle that discrimination may be based on gendered stereotypes of masculinity applies with equal force where, as is the case here, a man is punished for straying from gender norms established in that environment.[10] *See Nichols v. Azteca Rest. Enter.*, 256 F.3d 864, 875 (9th Cir. 2001) (holding that a man who was derided by his coworkers for having effeminate mannerisms and dating a woman "who was his friend" constituted harassment on the basis of sex). Under a gendered stereotyping theory, deviation from the gendered stereotype is the inferential source of the discrimination.[11]

For the same reason, the Court rejects Defendant's theory at oral argument that Plaintiff cannot allege a hostile work environment based on insults disparaging his sexual habits and preferences because "men are generally celebrated for their sexual adventures."[12] That Plaintiff does not claim to be a woman or to be a gay man does not vitiate his allegations

---

[10] *See id.* at 131.

[11] *Id.* at 153 (Courts "must infer intent when the plaintiff deviates from those norms; otherwise, the law permits sex stereotyping to persist unchecked, and it naturalizes unspoken requirements about behavior as just the way men and women are").

[12] Defendant argues that "whore" is a term meant to describe a "sexually promiscuous woman" and it does not apply to him as a man in a hostile work environment claim, implying that the term could contribute to a legally viable claim if Plaintiff was a woman. (Def.'s Mot. at 8.) Curiously, Defendant admits that a "gigolo"—as Plaintiff claims he was "branded" in his workplace—is a sexually derogatory term about a man suggesting that he is a paid escort. But Defendant argues that the word "gigolo" does not speak to Plaintiff's status as a man, but rather to "what others may or not perceive his morality to be." (*Id.* at 8-9.) This position undermines Defendant's argument as to why the word "whore" would not apply to Plaintiff given that it ignores the moral commentary associated with *that* term.

In any event, that argument misses the point. To the extent Plaintiff alleges that the term gigolo was pervasively used to ridicule him for deviating from masculine stereotypes, the Court may infer that use of the term contributed to a hostile work environment along with the other terms that carried grossly offensive sexual meaning. *Cf. Zarda*, 883 F.3d at 122 (rejecting a similar argument that negative views about employees with same sex attractions are rooted in moral beliefs because "it's simply impossible" to disassociate moral beliefs about sexual orientation from sex).

that Defendant's representatives called him "whore" or "gay" or "homosexual." (*See* Def.'s Mot. at 7-8.) The focus here is on whether "one of the reasons for the harassment . . . was that [he] was a [man]," *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998), not on Plaintiff's sexual preferences or the generic connotations of the terms chosen by his harassers, *see Nichols*, 256 F.3d at 874 (accepting a hostile work environment claim where "the most vulgar name-calling directed at [the male plaintiff] was cast in female terms").

Words carry consequences. When they communicate sexual enmity normally prohibited from the workplace and are targeted relentlessly at one individual, they have legal consequence. That proposition is clear from the text of Title VII. *See* 42 U.S.C. § 2000e–2(e) (forbidding employers' decisions "to discriminate with respect to his compensation, terms, conditions, or privileges of employment," or "otherwise adversely affect his status as an employee, because of such individual's . . . sex."). All that is necessary to draw a plausible inference that discrimination was "because of" Plaintiff's sex is that Plaintiff allege facts suggesting that the hostility he faced "relied upon sex-based considerations," *Price Waterhouse*, 490 U.S. at 241-42, and that the hostility was so severe and pervasive as to affect the conditions of his employment, *Harris*, 510 U.S. at 21. Plaintiff has done so. Therefore, Defendant's motion to dismiss Plaintiff's hostile work environment claims is denied.

### B. Disparate Treatment

Defendant next argues that Plaintiff has failed to plead any facts that would form the basis of an adverse employment action or any facts which plausibly suggest that he was treated differently than some other class of comparators. (Def.'s Mot. at 13.) Specifically, Defendant notes that Plaintiff's disparate treatment allegations are based on the same facts as his hostile work environment claims and emphasizes that Plaintiff does not discuss how female workers were treated by Defendant's representatives outside of two allegations in

14

which he was given harder work assignments while two female employees were given his preferred assignments. (*Id.* at 13-14.) Plaintiff does not provide arguments in addition to the allegations made in the Second Amended Complaint regarding his disparate treatment claims.

"A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010) (internal quotation marks omitted). An adverse employment action "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71-72 (2d Cir. 2019) (citing *Patrolmen's Benevolent Ass'n of City of N.Y. v. City of N.Y.*, 310 F.3d 43, 51 (2d Cir. 2002) (internal quotation marks omitted)). But such action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* at 71; *see also Outley v. Luke & Assocs.*, 840 F.3d 212, 217 (5th Cir. 2016) (holding a transfer without pay-cut is not an adverse employment action).

To properly claim disparate treatment, Plaintiff must allege that he was treated differently than similarly situated individuals who were not members of his protected class. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). This showing requires that Plaintiff be "similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself]." *Graham*, 230 F.3d at 39 (citing *Shumway*, 118 F.3d at 64).

Here, Plaintiff's allegations that he received disparate treatment are perfunctory because he does not adequately allege an adverse employment action. To support his claim,

Plaintiff alleges only that he was not given his preference for classroom assignments as a teacher, and that he was given students who were more "difficult and challenging" while female coworkers were given classrooms for which he indicated he had a preference. (Am. Compl. ¶¶ 55-57.)

These allegations fall short because they do not give rise to an inference of a sufficiently adverse employment action to trigger Title VII's protections. The adverse employment actions Plaintiff alleges were assignments to more "difficult and challenging" classrooms on four occasions. Without more, however, the alleged adverse actions, while inconvenient or even requiring Plaintiff to adjust his job responsibilities, do not reach the level of adverse employment action recognized by the Second Circuit. *See Fox*, 918 F.3d at 71 (instructing that an adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities").

Because the Second Amended Complaint is deficient regarding his disparate treatment claim and Plaintiff makes no argument in response to Defendant's motion to dismiss, Defendant's motion is granted with respect to those claims.

### C. Wrongful Termination

Although Plaintiff's Second Amended Complaint alleges wrongful termination when he was terminated in July 2019, (Am. Compl. ¶¶ 61-62), as with his disparate treatment claims, he does not provide further factual matter in his Amended Complaint or explain in his brief why his termination was wrongful under the law. Plaintiff alleges merely that Defendant terminated him "as the culmination of the hostility and social aggression permitted by management of the Defendant and directed at him by management and employees of the Defendant." (*Id.* ¶ 61.) Defendant, however, argues that "Plaintiff, beyond this bare assertion of his own protected classes, pleads no other facts that plausibly suggest

16

any manner of causal nexus, however attenuated, between any adverse employment action and any protected class." (Def.'s Mem. at 17.)

To allege a prima facie showing of wrongful termination, a plaintiff must allege that "he (1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class." *Graham*, 230 F.3d at 38. Successful claims of wrongful termination must present a causal connection between some discriminatory reason and the termination. *See Quarless v. Brooklyn Botanic Garden Corp.*, 611 F. App'x 28, 29 (2d Cir. 2015) (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

Plaintiff's Second Amended Complaint is facially deficient and does not state a plausible claim for wrongful termination. Plaintiff claims that he was terminated July 25, 2019 "for vague reasons" at the culmination of the harassment he alleges he endured. (*Id.* ¶¶ 39-40, 61.) His allegations, however, do not speak to his performance as a substitute teacher. In fact, he alleges that he showed children a concededly inappropriate video before he was terminated. (*Id.* ¶¶ 34-38.) This allegation speaks not only to his performance as a substitute teacher, but also the cause of his termination. Thus, the Second Amended Complaint itself alleges facts suggesting that Defendant had a legitimate, non-discriminatory reason for terminating Plaintiff. Plaintiff offers nothing of substance to rebut this concession.

Moreover, Plaintiff does not produce allegations sufficient to draw inferences that he was terminated on alternative, impermissible grounds. In neither Plaintiff's Second Amended Complaint nor his opposition brief does he argue that his termination was the result of animus toward his alleged protected status. As Defendant emphasizes, "Plaintiff never alleges any alternative reason, even in the form of a perfunctory, conclusory statement that Plaintiff's termination was because of discrimination of some kind." (Def.'s Mot. at 18.)

Instead, Plaintiff appears to rely on the temporal proximity between the alleged harassment and his termination, stating that the termination was at the "culmination" of the hostility. (Am. Compl. ¶ 61.) But Plaintiff does not allege that the termination was the result of retaliation for some action or event in time. Without more, the Second Amended Complaint does not allege facts justifying an inference that the termination was caused by the same animus which motivated his alleged hostile work environment allegations. *See Smith v. Cingular Wireless*, 579 F. Supp. 2d 231, 243 (D. Conn. 2008) (explaining that the issue in a wrongful termination case is whether the plaintiff can link the circumstances of the termination to discrimination based on that individual's protected status).

Given that Plaintiff does not provide any facts or allegations that his termination was caused by hostility toward his protected status, Defendant's motion to dismiss his wrongful termination claims is granted.

## IV.   Conclusion

For the forgoing reasons, Defendant's Motion to Dismiss [Doc. # 34] is DENIED with respect to Plaintiff's hostile work environment claims and GRANTED with respect to Plaintiff's disparate treatment and wrongful termination claims.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 17th day of December 2021